1
2
3
4
5               UNITED STATES DISTRICT COURT
6               NORTHERN DISTRICT OF CALIFORNIA
7
8   ANURAG TIWARI,                           No. C-08-3988 EMC
9           Plaintiff,
10      v.                                   **ORDER DENYING DEFENDANT'S
                                             MOTION TO DISMISS; GRANTING IN
                                             PART AND DENYING IN PART
11  NBC UNIVERSAL, INC.,                     DEFENDANT'S MOTION TO STRIKE;
                                             AND DENYING DEFENDANT'S
12          Defendant.                       MOTION FOR PROTECTIVE ORDER**
13  _____/        **(Docket Nos. 79, 84, 85)**
14
15          Plaintiff Anurag Tiwari filed suit against Defendant NBC Universal, Inc., asserting both

16  federal and state law claims based on NBC's production, filming, and broadcast of a program

17  entitled "Dateline NBC: To Catch a Predator."  The operative complaint is the third amended

18  complaint ("TAC").  Currently pending before the Court are three motions filed by NBC: (1) a

19  motion to dismiss the federal claim (brought pursuant to 42 U.S.C. § 1983); (2) a motion to strike

20  the state claims (for intentional infliction of emotional distress and defamation); and (3) a motion for

21  a protective order.

22          Having considered the parties' briefs and accompanying submissions, as well as the oral

23  argument of counsel, the Court hereby **DENIES** the motion to dismiss, **GRANTS** in part and

24  **DENIES** in part the motion to strike, and **DENIES** the motion for a protective order.

25                  **I.    FACTUAL & PROCEDURAL BACKGROUND**

26          In his complaint, Mr. Tiwari alleges as follows.

27          "To Catch a Predator" was a television series created, developed, and produced by NBC.

28  *See* TAC ¶ 15.  "[T]he mainstay of the show was humiliation of individuals lured to a so-called

**United States District Court**
For the Northern District of California

'sting house' by internet, email or telephone conversations with adult 'decoys' posing as teenagers."
*Id.* Individuals who were successfully lured to the sting house were ultimately confronted by a NBC
television crew, including reporter, Chris Hansen. *See id.* After the individuals left the house,
uniformed police officers would rush in, with guns leveled, and arrest the individuals. *See id.*

To make the show, NBC paid adults persons working for an organization known as Perverted
Justice Foundation ("PJF") to create false personas, sign on to adult-only internet chat rooms, and
engage in discussions with other chat room participants. *See id.* ¶ 16. The only purpose of these
PJF decoys was to lure targeted chat room participants to a sting house rented by NBC for the
filming of the show. *See id.*

In making the show, NBC secured not only the assistance of PJF decoys but also, as
indicated above, the assistance of local law enforcement. In fact, NBC paid money to local law
enforcement and/or provided them with other things of value – *e.g.*, cameras, recording equipment,
and media used to capture the stings, take-downs, arrests, and subsequent police interrogations. *See
id.* ¶ 19. As alleged in the TAC, NBC directed and controlled the timing, setting, and conditions
under which law enforcement officials arrested or interrogated the individuals targeted by NBC and
PJF. *See id.* ¶ 20. For example, NBC and law enforcement agreed that the targets would be arrested
only after they had been confronted by the NBC news reporter (Chris Hansen) and NBC's cameras.
NBC also instructed law enforcement "to give special intensity to arrests – including rushing targets,
surrounding them, hollering at them, throwing them to the ground or against walls, roughly hand-
cuffing them, and drawing of weapons – so as to enhance the camera effect." *Id.* Finally, NBC paid
or helped law enforcement in devising special booking and interrogation areas that allowed NBC to
watch, listen in on, and record police interrogations with the individuals. *See id.* ¶ 21. In addition,
for the interrogations, NBC provided law enforcement with purported chat room logs or other
recording it received from PJF. *See id.*

In Mr. Tiwari's case, NBC worked in conjunction with law enforcement from Petaluma. *See
id.* ¶ 25. Consistent with the above, Mr. Tiwari was lured to a sting house set up by NBC by a PJF
decoy in August 2006. *See id.* ¶¶ 30-32. In the back yard of the house, Mr. Tiwari was surprised

**United States District Court**

For the Northern District of California

1  and confronted by Mr. Hansen and NBC cameras.  *See id.* ¶ 32.  After being confronted by Mr.

2  Hansen, Mr. Tiwari left the back yard and walked into the garage,

> at which point approximately half a dozen police officers rushed and
> shouted at [him] in a loud and dramatic manner.  Although [Mr.
> Tiwari] was unarmed, several of the police officers had their guns
> drawn and aimed at [his] head.  Police officers forcefully pushed [him]
> against the garage wall, yanked his arms behind his back, handcuffed
> him, and transported him down the driveway and away from the set.

7  *Id.* ¶ 33.  Mr. Tiwari was then taken to a "makeshift 'pre-booking' area at the Petaluma airport

8  constructed by NBC and law enforcement personnel for the Catch episode."  *Id.* ¶ 34.  NBC filmed

9  Mr. Tiwari arriving at the pre-booking facility and then his interrogation there.  *See id.* ¶¶ 6, 35.  It

10  was not until the end of the interview that the detective conducting the interrogation revealed that

11  the cameras and recording equipment within the booking area belonged to NBC and that the filming

12  was to be used for an episode of Dateline.  *See id.* ¶ 35.

13        Ultimately, Mr. Tiwari was charged with two felony criminal charges.  One charge was

14  eventually dismissed, and Mr. Tiwari was arraigned on the other.  On December 21, 2007, the

15  Sonoma County District Attorney dismissed the second felony charge and filed an amended

16  information charging Mr. Tiwari with a single misdemeanor offense.  Mr. Tiwari was acquitted of

17  the misdemeanor offense in August 2009.  The District Attorney subsequently charged Mr. Tiwari

18  with a different misdemeanor offense.  It appears that Mr. Tiwari was convicted of this

19  misdemeanor, *see* Cal. Pen. Code § 272, but, after Mr. Tiwari appealed, the charge was reduced to a

20  criminal infraction in a plea deal reached in July 2010.  *See* Docket No. 85 (Mot. at 1); *see also* TAC

21  ¶ 42 (noting that all criminal proceedings against Mr. Tiwari were resolved in July 2010 with Mr.

22  Tiwari's agreement to plead no contest to an infraction and payment of a $30 court security fee).

23        The "To Catch a Predator" episode featuring Mr. Tiwari was first aired on October 6, 2006.

24  *See id.* ¶ 40.  On October 9, 2006, the first business day after the initial broadcast, Mr. Tiwari was

25  put on administrative leave by his employer and then was forced to resign shortly thereafter.  *See id.*

26  ¶ 41.  The show was then rebroadcast several times a year in 2007, 2008, and 2009.  The show was

27  also posted in MSNBC's internet website.  *See id.* ¶ 43.  On October 24, 2010, NBC re-aired the

28  show on the MSNBC cable channel.  By this time, Mr. Tiwari had already initiated this lawsuit (in

United States District Court

For the Northern District of California

1  2008) and all criminal proceedings have been resolved, as noted above, with Mr. Tiwari pleading no

2  contest to an infraction.  However, the October 2010 telecast included an epilogue stating that Mr.

3  Tiwari had been convicted of attempted lewd and lascivious acts with a child, which is a felony

4  under California law.  *See id.* ¶ 44.

5       Based on, *inter alia*, the above allegations, Mr. Tiwari has asserted three claims against

6  NBC: (1) violation of his civil rights pursuant to § 1983; (2) intentional infliction of emotional

7  distress; and (3) defamation.  In the § 1983 claim, Mr. Tiwari asserts that both his Fourth

8  Amendment and substantive due process rights were violated.  The defamation claim is based on the

9  October 2010 epilogue only.

10                                      **II.**   **DISCUSSION**

11  A.    <u>Motion to Dismiss</u>

12       1.    <u>Legal Standard</u>

13       In its first motion, NBC asks the Court to dismiss the § 1983 claim – both the Fourth

14  Amendment and substantive due process components – pursuant to Federal Rule of Civil Procedure

15  12(b)(6).  Under Rule 12(b)(6), a party may move to dismiss based on the failure to state a claim

16  upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to dismiss based on Rule

17  12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks Sch. of Bus. v. Symington*,

18  51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court must take all allegations

19  of material fact as true and construe them in the light most favorable to the nonmoving party,

20  although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule

21  12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  While "a complaint

22  need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief

23  that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual

24  content that allows the court to draw the reasonable inference that the defendant is liable for the

25  misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v.*

26  *Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to a 'probability

27  requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully."  *Id.*

28

2.      Fourth Amendment

According to Mr. Tiwari, his Fourth Amendment rights were violated because NBC's actions amounted to a seizure that intruded on his privacy rights and the seizure was unreasonable because it was conducted "in a manner designed to cause humiliation to [Mr. Tiwari] with no legitimate law enforcement purpose or objective."  TAC ¶ 8.  In response, NBC argues that the claim should be dismissed because (1) its actions are protected by the First Amendment; (2) Mr. Tiwari had no reasonable expectation of privacy; and (3) even if Mr. Tiwari had a reasonable expectation of privacy, part of the claim – *i.e.*, that predicated on the alleged use of excessive force – should still be dismissed because (a) Mr. Tiwari fails to make a plausible claim that NBC directed the manner of his arrest and (b) the Petaluma police, as a matter of law, did not use excessive force in arresting him.  For the reasons discussed below, the Court rejects each of these arguments.

a.      First Amendment Defense

NBC first contends that the Fourth Amendment claim should be dismissed because its actions are protected by the First Amendment.  NBC's argument is predicated on its belief that, with respect to this claim, Mr. Tiwari is seeking "broadcast damages," Mot. at 1 – *i.e.*, damages based on the broadcast of the "To Catch a Predator" episode featuring him.

NBC's belief is not entirely baseless.  For example, in paragraph 7 of his TAC, Mr. Tiwari alleges that, "as a direct result of the broadcast, [he] was placed on administrative leave from his employment as a software engineer and forced to resign shortly thereafter."  TAC ¶ 7.  That same allegation is repeated later on in the TAC at paragraph 41.  *See* TAC ¶ 41 ("On October 9, 2006, the first business day after the initial broadcast, Plaintiff was put on administrative leave by his employer.  Plaintiff was forced to resign shortly thereafter.").  However, in his opposition brief, Mr. Tiwari seems to take the position that he is not seeking damages based on NBC's "dissemination of information" (which constitutes speech) but rather is seeking damages based on NBC's "act of information gathering" (which constitutes conduct only).  Opp'n at 9.  At the hearing, Mr. Tiwari confirmed that, with respect to his Fourth Amendment claim, he does not seek any broadcast damages.

United States District Court

For the Northern District of California

In light of this statement, the Court agrees with Mr. Tiwari that the First Amendment argument as framed and asserted by NBC herein[1] is inapplicable.  It is plausible that Mr. Tiwari suffered damages based on NBC's nonbroadcast conduct alone – *e.g.*, NBC's alleged direction to law enforcement that it arrest Mr. Tiwari in a sensational way.  Notably, in *Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380 (S.D.N.Y. 2008) – a case initiated by a person who, like Mr. Tiwari, was targeted in a "To Catch a Predator" sting – Judge Chin of the Southern District of New York allowed a Fourth Amendment claim against NBC to proceed.  Although the media defendants did not expressly raise a First Amendment defense, Judge Chin balanced counterveiling interests including those which parallel interests protectible by the First Amendment.  For example, he noted that, "[a]lthough there are legitimate reasons for publicizing arrests, the amended complaint plausibly asserts that many of the police officers' actions were motivated not by a genuine law enforcement need, but by Dateline's desire for more sensational footage." *Id.* at 390.  Other courts have also allowed Fourth Amendment claims in the face of media involvement and assertion of interests akin to those protected by the First Amendment.  *Cf. Wilson v. Layne*, 526 U.S. 603, 614 (1999) (concluding that it was "a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of third parties in the home was not in aid of the execution of the warrant"); *Berger v. Hanlon*, Nos. 96-35251, 96-35266, 1999 U.S. App. LEXIS 28883, at *2-3 (9th Cir. Aug. 27, 1999) (in case where federal officers permitted media to accompany them during execution of search warrant, affirming – on remand from the Supreme Court – grant of summary judgment in favor of federal officers based on qualified immunity; but allowing Fourth Amendment claim to proceed against media defendants since they had not asserted and were not entitled to qualified immunity).

NBC argues that even its conduct should be considered speech because the production and the broadcast of the show are inextricably intertwined.  *See* Mot. at 10 (arguing that the Court should reject "Plaintiff's last-ditch attempt to shift the focus from the broadcast to the production of the

---

[1] NBC predicates its First Amendment defense on the broadcast aspect of Mr. Tiwari's complaint.  NBC does not assert a First Amendment defense based on an interest in media news gathering in the production aspect of the filming.

1    broadcast . . . as the courts have made clear that such a false distinction between these two

2    intertwined activities is untenable").  That argument lacks merit.  NBC relies solely on a Seventh

3    Circuit decision, *Desnick v. American Broadcasting Cos.*, 44 F.3d 1345 (7th Cir. 1995) (involving

4    suit brought by ophthalmic clinic, its owner, and two surgeon employees against ABC, a producer,

5    and a reporter for, *inter alia*, trespass and defamation arising out of the production and broadcast of

6    a program segment of "PrimeTime Live" that was highly critical of the clinic).  But *Desnick*

7    distinguishes the rights that obtain in production versus broadcast; it does not find the two processes

8    are so inherently intertwined that they must be treated as a single uniform act.  *See id.* at 1355 ("If

9    the broadcast does not contain actionable defamation, and no established rights are invaded in the

10   process of creating it (for the media have no general immunity from tort or contract liability), then

11   the target has no legal remedy even if the investigatory tactics used by the network are surreptitious,

12   confrontational, unscrupulous, and ungentlemanly.") (emphasis added); *see also id.* ("[N]one of

13   [plaintiffs'] established rights under state law or the federal wiretapping law was infringed by the

14   making, as opposed to the dissemination, of the broadcast segment of which they complain, with the

15   possible and possibly abandoned exception of contract law.").

16                  b.    Reasonable Expectation of Privacy

17        NBC contends that, notwithstanding the above, the § 1983 claim predicated on the Fourth

18   Amendment must be dismissed because Mr. Tiwari could not, as a matter of law, have an

19   objectively reasonable expectation of privacy in the home of a third party or in the Petaluma airport

20   (*i.e.*, the pre-booking area constructed by NBC).  *See* Mot. at 18 ("Fundamentally, Plaintiff would

21   have to show that he had 'dominion and control' over the house and the pre-booking area of the

22   airport – the only places where filming took place – to make a viable Fourth Amendment claim

23   based on an unreasonable search and seizure.").

24        While NBC's argument is not without any merit, the Court rejects it, finding the Second

25   Circuit's analysis in *Lauro v. Charles*, 219 F.3d 202 (2d Cir. 2000), persuasive.  In *Lauro*, the issue

26   was whether a staged "perp walk" – *i.e.*, a transfer of an arrestee by the police from one location to

27   another, done at the request of the press and for no reason other than to allow the arrestee to be

28   photographed – violated the Fourth Amendment.  The arrestee in *Lauro* was taken on a staged perp

walk from an unmarked police car to the police station house.  *See id.* at 204-05.  This was clearly a

public area over which the arrestee lacked dominion and control, and not a private home.  The court,

however, rejected the defendant's contention that there could be no Fourth Amendment violation

because the arrestee had no reasonable expectation of privacy outside of a private home.  It

acknowledged that the Fourth Amendment accords "particular gravity" to government intrusions on

the privacy of one's home.  But prior case law, the court emphasized, did not "turn[] solely on the

special status of the home" or say that "the Fourth Amendment's privacy protections end at the door

of one's house."  *Id.* at 211.  Rather, "long-standing Fourth Amendment jurisprudence . . . has

declined to set spacial boundaries on the rights protected by that amendment.  For, as the Supreme

Court has famously stated, 'the Fourth Amendment protects people, not places.'"  *Id.*  The court did

go on to note that "the place where police conduct occurs is [not] irrelevant to our analysis whether

that conduct violates a privacy right under the Fourth Amendment.  Far from it.  But it cannot be

determinative."  *Id.* (emphasis added).  As an example, the court pointed to the legality of a "stop

and frisk" of a person on a public street.

> [T]he [Supreme] Court [in *Terry v. Ohio*, 392 U.S. 1 (1968)]
> recognized the significant intrusion upon dignitary and privacy
> interests that occurs when a person is physically handled by the police,
> and commented that "such a procedure performed in public by a
> policeman while the citizen stands helpless . . . is a serious intrusion
> upon the sanctity of the person, which may inflict great indignity and
> arouse strong resentment."

*Id.* at 211-12; *see also Caldarola v. County of Westchester*, 343 F.3d 570, 575-76 (2d Cir. 2003)

(although stating that plaintiff's reasonable expectation of privacy on employer Department of

Corrections's grounds was "minimal," still recognizing some privacy interest).

     The Court acknowledges that the facts in *Lauro* are different from those in the instant case.

Most notably, in *Lauro*, the intrusion on the sanctity of the person arose because the arrestee was

forced to do a perp walk before the public and in front of television cameras.  *See id.* at 212 (noting

that the arrestee was physically restrained by handcuffs and the defendant-detective and, "[i]n that

humiliating position, . . . was made to walk outside the precinct house, was driven around the block,

and was then forced to walk back into the precinct house, in front of television cameras").  Here,

because Mr. Tiwari has stated that the broadcast is not a part of his Fourth Amendment claim, he

8

United States District Court

For the Northern District of California

1  will have to argue that the sanctity of his person was intruded upon simply because NBC filmed

2  what took place, not because it subsequently broadcast the event.

3       Ultimately, though, the Court finds in Mr. Tiwari's favor, at least at this juncture, because,

4  even if there were at best only a minimal privacy interest,[2] Mr. Tiwari could still prevail at the end

5  of the day if there were no legitimate purpose served by NBC's actions.  This is the point that was

6  underscored by the Second Circuit case on which NBC primarily relies, *i.e.*, *Caldarola v. County of*

7  *Westchester*, 345 F.3d 570, 576 (2d Cir. 2003) ("A careful reading of *Lauro* . . . reveals that it was

8  not the magnitude of Lauro's privacy interest that enabled him to prevail on his claim, but instead

9  the lack of any legitimate purpose served by 'an inherently fictional dramatization of an event that

10  transpired hours earlier.'").  A reasonable jury could find in Mr. Tiwari's favor based on the

11  allegations in his complaint – *e.g.*, that it was not necessary for law enforcement to wait until after

12  Mr. Hansen confronted Mr. Tiwari before arresting him, that it was not necessary for law

13  enforcement to arrest Mr. Tiwari in a sensational way, and that it was not necessary to film Mr.

14  Tiwari physically restrained and in handcuffs during his detention and interview with the police.

15  *See TAC* ¶¶ 5, 20, 28, 35; *see also Conradt*, 536 F. Supp. 3d at 390 ("conclud[ing] that a reasonable

16  jury could find that the intrusion on Conradt's privacy [albeit in his home] substantially outweighed

17  the promotion of legitimate governmental interests").

18       c.    Excessive Force

19       Finally, NBC contends that, even if the Fourth Amendment claim is not dismissed based on

20  an unreasonable expectation of privacy, part of the claim – *i.e.*, that predicated on the use of

21  excessive force in the arrest – should still be dismissed for two reasons: (1) Mr. Tiwari fails to make

22  a plausible claim that NBC directed the manner of his arrest and (2) the Petaluma police, as a matter

23  of law, did not use excessive force in arresting him.

24       As to the first argument, NBC relies on a document that was attached to Mr. Tiwari's

25  original complaint, *i.e.*, the Petaluma police's operations order for the "To Catch a Predator" sting.

26

27       [2]  The parties have not addressed the degree to which the privacy invasion is enhanced by the
fact that it was filmed, thus leaving the video record within the control of NBC and outside of Mr.
28  Tiwari's control.

9

1   *See* Compl., Ex. 4 (police operations order).  NBC points out that the order states: "Other than the

2   video and audio surveillance, at no time will personnel from pervertedjustice.com or NBC Dateline

3   participate in, or be involved in the physical arrest of any suspect." *Id.* at 3.  But contrary to what

4   NBC asserts, this language on its face does not clearly establish that NBC did not direct the manner

5   of Mr. Tiwari's or other individuals' arrests.  The language could be to mean that individuals

6   affiliated with NBC simply should not physically assist in the arrest of these persons, *i.e.*, leaving

7   open the possibility that NBC still had some input in how the arrest was to take place.

8        As for the second argument, a reasonable jury could find that the force used, which included

9   the deployment of half a dozen officers, the aiming of weapons at Mr. Tiwari's head, and pushing

10  him against a wall, was excessive under the circumstances, especially the fact that Mr. Tiwari was

11  alone, unarmed, and was being arrested for conduct that did not involve physical violence.  *See*

12  *generally Smith v. City of Hemet*, 394 F.3d 689, 700-04 (9th Cir. 2005) (en banc) (noting that, in

13  determining whether the force used was reasonable, a court considers factors such as the severity of

14  the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others,

15  whether the suspect is actively resisting arrest or attempting to evade arrest by flight, or whether

16  there are alternative methods of capturing or subduing the suspect; adding that the reasonableness of

17  the force used is ordinarily a question of fact for the jury).  *Cf. Conradt*, 536 F. Supp. 2d at 390

18  (noting that police officers' actions were motivated not by a genuine law enforcement need but

19  rather by NBC's desire for more sensational footage as evidenced by, *e.g.*, the use of more than a

20  dozen officers to arrest a person not suspected of being violent or having a gun and the use of a

21  SWAT team).

22        d.   Summary

23        Because the Court rejects each of NBC's arguments with respect to the Fourth Amendment

24  claim, the motion to dismiss that claim is denied.

25        3.   Substantive Due Process

26        In his TAC, Mr. Tiwari indicates that his claim for violation of substantive due process is

27  predicated on his right to be free from pretrial punishment.  *See* TAC ¶ 8.  Under Supreme Court

28  precedent, the due process clause protects a detainee from being "'punished prior to an adjudication

United States District Court

For the Northern District of California

1    of guilt.'"  *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004).  "For a particular governmental

2    action to constitute punishment, (1) that action must cause the detainee to suffer some harm or

3    'disability,' and (2) the purpose of the governmental action must be to punish the detainee."  *Id.*

4         Relying on *Demery*, NBC argues that the substantive due process claim should be dismissed,

5    but the portion of *Demery* that NBC cites does not support its position.  Contrary to what NBC

6    suggests, the Ninth Circuit did not hold in *Demery* that a one-time filming of an arrestee can never

7    constitute punishment; it was simply less intrusive than the sheriff's policy at issue in *Demery*

8    pursuant to which four webcams were set up and streamed live images of pretrial detainees to

9    Internet users all over the world.  *See id.* at 1031 n.4.

10        NBC contends that, nevertheless, the substantive due process claim lacks merit because,

11   ultimately, the punishment for which Mr. Tiwari is suing is the public exposure of his conduct via

12   the broadcast of the "To Catch a Predator" episode – which implicates NBC's First Amendment

13   rights.  At the hearing, Mr. Tiwari tried to argue that he was not seeking broadcast damages with his

14   substantive due process claim, but this is not a plausible position.  Mr. Tiwari contends that his

15   injuries (*i.e.*, his humiliation) were exacerbated by the broadcast of the show; therefore, as NBC

16   maintains, the First Amendment is at issue here (in contrast to the Fourth Amendment claim above).

17        That being said, the Court does not agree with NBC's position that the First Amendment

18   automatically insulates it from liability.  As the Second Circuit has noted, the First Amendment does

19   not set up "a wall of immunity protecting newsmen from *any* liability for their conduct while

20   gathering news."  *Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir. 1973) (emphasis added).  The First

21   Amendment privilege of the media "is not absolute . . . and as in other areas involving the media, the

22   right of the individual to keep information private must be balanced against the right of the press to

23   disseminate newsworthy information to the public."  *Gilbert v. Medical Econs. Co.*, 665 F.2d 305,

24   307 (10th Cir. 1981).  At this juncture of the proceedings, the Court cannot say that, as a matter of

25   law, the balance in this case weighs in favor of NBC.

26        Accordingly, the motion to dismiss the substantive due process claim, like the motion to

27   dismiss the Fourth Amendment claim, is denied.

28

B.      Motion to Strike

Whereas NBC's motion to dismiss targeted the federal claims in the TAC, NBC's motion to strike is targeted at the state law claims – *i.e.*, the claims for intentional infliction of emotional distress and defamation.

California law authorizes a special motion to strike an action arising from an act in furtherance of a person's right of petition or free speech under either the United States or California Constitution in connection with a public issue.  *See* Cal. Code Civ. Proc. § 425.16.  Section 425.16 provides in relevant part as follows:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

*Id.* § 425.16(b)(1).  The statute also directs that, "[i]n making [the above] determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  *Id.* § 425.16(b)(2).

Although, as indicated above, the statute suggests that evidence will be presented in conjunction with a special motion to strike, federal district courts have indicated that, where such a motion is brought in federal court, it "may be based on a defect in a complaint, including legal deficiencies addressable on a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6), or a failure to support a stated claim with evidence, analogous to a [Rule] 56 summary judgment motion."  *Carr v. Asset Acceptance, LLC*, CV F 11-0890 LJO GSA, 2011 U.S. Dist. LEXIS 89862, at *8 (E.D. Cal. Aug. 12, 2011).

In the instant case, NBC seems to make both Rule 12(b)(6) arguments and Rule 56 arguments.  To the extent NBC has made Rule 56 arguments (*e.g.*, arguing that the intentional infliction claim should be dismissed based on a declaration from a producer (Lynn Keller) that NBC did not pay the police or direct the police to arrest Mr. Tiwari in a particular way, or arguing that the defamation claim should be dismissed because NBC simply published information in the epilogue that it obtained from the state court), Mr. Tiwari makes a fair point that he needs discovery from

NBC in order to defend the motion – and NBC has refused to provide discovery pending the resolution of the motions to dismiss and strike. *See Carr v. Asset Acceptance, LLC*, CV F 11-0890 LJO GSA, 2011 U.S. Dist. LEXIS 89862, at *8 (E.D. Cal. Aug. 12, 2011) (stating that, where a SLAPP motion is brought in federal court, it "may be based on a defect in a complaint, including legal deficiencies addressable on a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6), or a failure to support a stated claim with evidence, analogous to a [Rule] 56 summary judgment motion"). Accordingly, the Court restricts its review at this juncture to an evaluation of the TAC and judicially noticeable facts similar to the standard under Rule 12(b)(6).

        1.    <u>Probability of Success</u>

As indicated above, under § 425.16, a party may file a special motion to strike where the cause of action against it arises from any act of that party in furtherance of its right of petition or free speech. In this case, Mr. Tiwari does not contest that NBC has the right to file a special motion to strike. *See* Opp'n at 8 ("assum[ing] that the procedures of Section 425.16 . . . apply . . . because [the statute] is to be 'construed broadly'"). Thus, the only question for the Court is whether that there is a probability that Mr. Tiwari will prevail on his claims for intentional infliction of emotional distress and defamation.

        2.    <u>Intentional Infliction of Emotional Distress</u>

        a.    <u>First Amendment Defense</u>

Similar to above, NBC challenges the claim for intentional infliction of emotional distress based on the First Amendment. The problem, once again, for NBC is that Mr. Tiwari's claim for intentional infliction appears to be based on NBC's production conduct only and not its broadcast of the show. To the extent NBC argues that Mr. Tiwari is in fact claiming broadcast damages for the intentional infliction, the Court disagrees. In paragraph 74 of the TAC, Mr. Tiwari alleges: "As a proximate and foreseeable result of being charged at and forcefully detained and arrested by armed police acting at NBC's direction, and upon discovering that he had been *filmed and recorded* by NBC in the manner herein alleged, Plaintiff suffered severe emotional distress . . . ." TAC ¶ 74 (emphasis added). The paragraph says nothing about NBC's act of broadcasting, only its act of filming and recording. Thus, the Court finds that the First Amendment as framed by NBC herein is

13

1    not implicated.  Contrary to what NBC suggests, it is plausible that Mr. Tiwari could have suffered

2    injury simply from the filming and recording of the events.  *See, e.g.*, *Conradt*, 536 F. Supp. 2d 380,

3    397 (S.D.N.Y. 2008) (where severe emotional distress was allegedly suffered based simply on

4    discovery of filming and recording by NBC because arrestee committed suicide while police and

5    NBC television crew were still outside (*i.e.*, pre-broadcast)).

6                   b.    Outrageous Conduct

7          NBC argues that, even if the First Amendment is not a complete defense, the claim for

8    intentional infliction should still be dismissed because Mr. Tiwari has failed to allow outrageous

9    conduct on the part of NBC.  NBC makes various arguments as to how the conduct identified by Mr.

10   Tiwari in the TAC, *see* TAC ¶ 70, is not outrageous as a matter of law.

11         Some of NBC's arguments appear to have some merit – *e.g.*, that its intrusion into Mr.

12   Tiwari's privacy cannot be outrageous as a matter of law given that Mr. Tiwari had little to no

13   expectation of privacy or that its paying PJF to create false persons and to act as adults decoys is not

14   outrageous as a matter of law because the conduct was not entrapment (or at least so a state court

15   found).  Potentially recognizing such, Mr. Tiwari seems to have narrowed the scope of his claim for

16   intentional infliction in his opposition brief.  The gravamen of the claim now seems to rest on NBC's

17   conduct of sensationalizing the incident.  *See* Opp'n at 9 (arguing that a claim has been adequately

18   pled based on allegations that "NBC planned, financed and directed the Petaluma-Catch sting to

19   such an extent that officers deviated from sound police practice, solely for the sake of creating a

20   dramatic television show").

21         So clarified, the Court concludes, as Judge Chin did in his "To Catch a Predator" case, that

22   "reasonable minds could differ as to whether NBC's conduct was so 'outrageous and extreme' as to

23   exceed all bounds of decency."  *Conradt*, 536 F. Supp. 2d at 396.  In *Conradt*, Judge Chin noted

24   that, as alleged, NBC did not simply conduct an investigation and inform law enforcement of the

25   decedent's suspected criminal activity.

26                 The amended complaint . . . alleges far more – it alleges that
                   NBC intruded into a law enforcement operation to such an extent that
27                 the police officers deviated from sound police practice, solely for the
                   sake of creating a more dramatic television show.  It alleges that what
28                 happened here was neither news nor law enforcement, but a blurring

                                          14

**United States District Court**
For the Northern District of California

> of the two with a tragic consequence – to avoid public humiliation, an otherwise law-abiding man was shamed into committing suicide, before he had been charged by any court, before he had any opportunity to be heard.  Significantly,  two of the circumstances that give rise to a finding of outrageousness are arguably present here: NBC was in a position of power, both with its ability to disseminate information to the public and with its apparent influence over the police, and NBC knew or should have known that Conradt was peculiarly susceptible to emotional distress and suicide.
>
> In considering whether NBC's conduct was outrageous, a jury could take note of the fact that, as alleged in the amended complaint, NBC failed to act "ethically" and violated "numerous journalistic standards."  The reporter-subject relationship is not monitored by statute, but the profession is guided by self-enforced principles and standards of practice.  Although unethical conduct, by itself, does not necessarily equate to outrageous conduct, the failure to abide by these journalistic standards may indeed be relevant to the jury's determination of whether Dateline acted in a reckless and outrageous manner.

*Id.* at 397.  Of course, some of the facts involved in *Conradt* are different from those presented in the instant case (*e.g.*, the target was a public official who committed suicide).  Nevertheless, the bottom line is that the alleged sensationalization of the news could be deemed outrageous – beyond the common bounds of decency – by a reasonable jury, particularly if this was done for no legitimate law enforcement purpose.  Most notably, if NBC did, as alleged in the TAC, direct the police to arrest Mr. Tiwari in a dramatic fashion with guns raised when there was no basis for such an approach, that act alone might be found outrageous.

The cases cited by NBC, *see Cowras v. Hard Copy*, 56 F. Supp. 2d 207 (D. Conn. 1999); *Veilleux v. NBC*, 8 F. Supp. 2d 23 (D. Me. 1998); *Reeves v. Fox TV Network*, 983 F. Supp. 703, 711 (N.D. Ohio 1997), do not affect the above analysis.  In each of these cases, it appears that the media defendant simply had a role in recording the events that took place.  There is nothing to indicate that the media defendant played an active role in staging and sensationalizing the events as NBC allegedly did here.

> c.   <u>Intent</u>

NBC further argues that the intentional infliction claim should be dismissed because Mr. Tiwari has failed to plead facts showing that NBC intended to cause severe emotional distress.  But under California law, the intent requirement can be satisfied by showing that the defendant

recklessly disregarded the probability of causing emotional distress. *See KOVR-TV, Inc. v. Superior Court*, 31 Cal. App. 4th 1023, 1028 (1995). Here, there are enough allegations to support a finding by a reasonable jury that NBC recklessly disregarded the probability of causing emotional distress. For example, if NBC instructed the police to arrest Mr. Tiwari in a sensational way, even though that was not necessary – *e.g.*, using multiple police officers with guns raised – then a reasonable jury could find that NBC acted in reckless disregard.

                  d.     <u>Severe Emotional Distress and Causation</u>

Finally, NBC contends that Mr. Tiwari has failed to allege severe emotional distress and that NBC's conduct was a proximate cause of that distress. These arguments, like those above, are not persuasive. First, NBC has failed to cite any authority establishing that nightmares cannot constitute severe emotional distress. The authorities cited on page 15 of NBC's motion do not so hold. Second, there are allegations indicating that the cause of the distress was not the broadcast but rather NBC's conduct. *See, e.g.*, TAC ¶ 74 (alleging that, "[a]s a proximate and foreseeable result of being charged at and forcefully detained and arrested by armed police acting at NBC's direction . . . Plaintiff suffered severe emotional distress").

                  e.     <u>Summary</u>

For the foregoing reasons, the Court concludes that Mr. Tiwari has sufficiently established a probability of success on the claim for intentional infliction of emotional distress, and therefore the motion to strike with respect to this claim is denied.

           3.     <u>Defamation</u>

Mr. Tiwari's defamation claim is predicated on the epilogue that NBC broadcast in October 2010. NBC makes three challenges to the defamation claim: (1) the claim is time barred; (2) NBC has a complete defense because the epilogue that was published was substantially true; and (3) NBC issued a retraction correcting the epilogue which puts the burden on Mr. Tiwari to plead special damages (*i.e.*, general damages are precluded).

                  a.     <u>Statute of Limitations</u>

There is no dispute between the parties that the defamation claim is subject to a one-year statute of limitations. *See* Cal. Code Civ. Proc. § 340(c) (providing for a one-year statute of

United States District Court

For the Northern District of California

1   limitations for, inter alia, an action for libel or slander).  Furthermore, there is no dispute between

2   the parties that

> [n]o person shall have more than one cause of action for damages for
> libel or slander or invasion of privacy or any other tort founded upon
> any single publication or exhibition or utterance, such as one issue of a
> newspaper or book or magazine or any one presentation to an audience
> or any one broadcast over radio or television or any one exhibition of a
> motion picture.

7   Cal. Civ. Code § 3425.3.  This is known as the single publication rule.  *See Shively v. Bozanich*, 31

8   Cal. 4th 1230, 1245 (2003).  Finally, there is no dispute that, "[u]nder the single-publication rule,

9   with respect to the statute of limitations, publication generally is said to occur on the 'first general

10  distribution of the publication to the public.'"  *Id.*

11        NBC argues that Mr. Tiwari's defamation claim is time barred based on the single

12  publication rule.  It points out that the allegedly defamatory epilogue at issue was first broadcast on

13  January 11, 2010 (and subsequently on February 7, April 18, June 28, and October 25).  *See* Lerner

14  Decl. ¶ 5.  Therefore, according to NBC, Mr. Tiwari should have asserted his defamation claim by

15  January 11, 2011; however, the TAC was not filed until May 23, 2011.

16        As an initial matter, the Court notes that, because it is restricting its review at this juncture to

17  that which applies under Rule 12(b)(6) rather than a summary judgment review under Rule 56, it

18  rejects NBC's argument – *i.e.*, NBC is introducing evidence beyond the complaint and of which the

19  Court cannot take judicial notice.  However, even if the Court were to entertain NBC's evidence, it

20  would still reject the argument on the merits because the single publication rule is inapplicable here

21  – *i.e.*, the January 2010 broadcast and the October 2010 broadcast (as well as those in between)

22  cannot be considered a single publication.

23        First, as noted above, the statute codifying the single publication rule provides that "[n]o

24  person shall have more than one cause of action for damages for libel or slander . . . founded upon

25  any single publication or exhibition or utterance, such as one issue of a newspaper or book or

26  magazine or any one presentation to an audience or any *one broadcast* over radio or television or

27  any one exhibition of a motion picture."  Cal. Civ. Code § 3425.3 (emphasis added).  Here, there

28  was not just one broadcast; rather, there was one broadcast and then several rebroadcasts.  While

17

United States District Court

For the Northern District of California

1    courts outside of California have differed as to whether a rebroadcast should be deemed a separate

2    publication, *see Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468, 484 (2009) (Werdegar, J., concurring)

3    (citing cases from, *e.g.*, Illinois and New York), there is no established law in California.  Justice

4    Werdegar of the California Supreme Court has suggested, however, in her concurrence in *Christoff*

5    that treating a rebroadcast as a separate publication is "more consistent with [the] statutory

6    language."  *Id.* (stating that "[s]ection 3425.3's reference to 'any one broadcast' . . . appears to

7    preclude a result like that in *Zoll v. Jordache Enterprises, Inc.* [a decision issued by a New York

8    district court], where two broadcasts of the same advertisement, separated by 22 years, were deemed

9    to be a single publication").  Justice Werdegar also pointed out that, under the Restatement (Second)

10   of Torts, subsequent broadcasts of the same material are deemed separate publications, and

11   "[s]ection 3425.3 clearly adopts the Restatement's view on this point by making 'any one broadcast'

12   a separate publication."  *Id.* at 485 n.4.  The Court finds Justice Werdegar's analysis persuasive.

13        Second, the fact that the broadcast and rebroadcasts took place over a significant period of

14   time (from January to October 2010) also suggests that the rebroadcasts should be deemed separate

15   publications.  *Compare Belli v. Roberts Bros. Furs*, 240 Cal. App. 2d 284 (1966) (concluding that

16   six substantially identical editions of a newspaper published over an eight-hour period constituted a

17   single issue and therefore a single publication), *with Christoff*, 47 Cal. 4th at 486 (Werdegar, J.,

18   concurring) (expressing doubt that a "five-year course of printing and distributing labels may be

19   deemed a single publication simply because the labels were not substantially altered during that

20   time"); *see also. id.* at 481 (noting that the single publication "rule does not address the issue of

21   repeated publications of the same libelous material over a substantial period of time").

22        Finally, that the rebroadcasts were presumably intended to reach a new audience (just as a

23   paperback edition of  book is intended to reach a new group of readers) also weighs in favor of

24   deeming them separate publications.  *See Kanarek v. Bugliosi*, 108 Cal. App. 3d 327, 333 (1980)

25   (concluding that a paperback edition of a book is a separate publication from the hardback edition

26   even if the editions are identical in form and content because the paperback version is "undoubtedly

27   intended to and d[oes] reach a new group of readers").  Notably, in her concurrence in *Christoff*,

28   Justice Werdegar indicated that one way to determine whether a republication should be treated as a

1  separate publication would be to look to whether the republication decision was "conscious and

2  independent." *Christoff*, 47 Cal. 4th at 485 (Werdegar, J., concurring) (internal quotation marks

3  omitted).  Thus, "whenever a defendant makes a 'conscious, deliberate choice to continue, renew or

4  expand [its] use' of [e.g., defamatory] material, the statute of limitations starts anew." *Alberghetti*,

5  713 F. Supp. 2d at 979.

6           b.    <u>Substantially True</u>

7           NBC contends that, even if the defamation claim is not time barred, it must still be dismissed

8  because the October 2010 epilogue was substantially true and therefore privileged under the First

9  Amendment and California Civil Code § 47(d).  Section 47(d) explicitly protects as privileged media

10  reports of official proceedings that are fair and true.  *See* Cal. Civ. Code § 47(d)(1) (providing that

11  "[a] privileged publication or broadcast is one made . . . [b]y a fair and true report in . . . a public

12  journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding").

13          Under California law, "whether or not a privileged occasion exists is a for the court to

14  decide, while the effect produced by the particular words use in an article and the fairness of the

15  report is a question of fact for the jury." *Handelsman v. San Francisco Chronicle*, 11 Cal. App. 3d

16  381, 386 (1970) (emphasis omitted).  However, "[t]he 'fair and true' issue is one of law when 'there

17  is no dispute as to what occurred in the [official] proceeding reported upon or as to what was

18  contained in the report.'" *Dorsey v. National Enquirer, Inc.*, 973 F.2d 1431, 1435 (9th Cir. 1991).

19          Although the Court, as discussed above, is conducting only a 12(b)(6) inquiry, there does not

20  appear to be any dispute that a privileged occasion exists; nor does there appear to be any dispute

21  over what occurred in the official proceeding or what was contained in the October 2010 epilogue.

22  Regarding the former, there appears to be no dispute that (1) Mr. Tiwari was initially convicted of a

23  criminal misdemeanor for attempting to communicate with a girl under 14 years of age for the

24  purpose of persuading and luring, or transporting, the girl away from home without parental consent,

25  a violation of California Penal Code § 272, and that (2) the charge was reduced to a criminal

26  infraction in a plea deal after Mr. Tiwari appealed the conviction. See Mot. at 1.  Regarding the

27  latter, there appears to be no dispute that the October 2010 epilogue stated as follows: "Anurag

28  Tiwari . . . [was] convicted of attempted lewd and lascivious acts with a child.  Tiwari was sentenced

1   to 2 years of probation.  If he successfully fulfills the terms of his probation his charge will be

2   reduced to the infraction of attempted illegal contact with a minor."  Lerner Decl. ¶ 5.  Given these

3   circumstances, the Court must decide the issue of whether the October 2010 epilogue was fair and

4   true as a matter of law.

5          Mr. Tiwari argues that the epilogue was not fair and true because "attempted lewd and

6   lascivious acts with a child" is a felony, and he was never convicted of a felony.  Whether a report is

7   fair and true turns on whether it "captures the substance of the proceedings."  *Dorsey*, 973 F.2d at

8   1436.  A report "'[is] to be measured by the natural and probable effect [it] would have on the mind

9   of the average reader.  [That is,] [t]he standard of interpretation to be used in testing alleged

10  defamatory language is how those in the community where the matter [was] published would

11  reasonably understand it.'"  *Id.*  Thus, as one state appellate court has explained, if the "gist" or

12  "sting" of the report is justified, then "a slight inaccuracy in the details will not prevent a judgment

13  for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the

14  reader of the article differently than the actual truth would."  *Handelsman*, 11 Cal. App. 3d at

15  387(internal quotation marks omitted).

16         *Jennings v. Telegram-Tribune Co.*, 164 Cal. App. 3d 119 (1985), which is one of the main

17  cited by NBC, is especially instructive given the facts in this case.  In *Jennings*, the plaintiff had

18  pled no contest to the misdemeanor offenses of willfully and knowingly failing to file income tax

19  returns for two calendar years.  *See id.* at 122.  The defendant newspaper initially reported that he

20  had been convicted of tax fraud based on the failure to file and subsequently reported that he had

21  pled no contest to income tax evasion based on the same.  *See id.* at 122-23.  The plaintiff sued the

22  newspaper because, *inter alia*, tax fraud and tax evasion were felonies.  *See id.* at 123.  At trial, the

23  plaintiff called an expert witness who testified that "failure to file a timely tax return is a

24  misdemeanor [only] which contains no element of an intent to defraud or to evade payment of

25  taxes."  *Id.* at 124.

26         On appeal, the state court held that the newspaper's reports were protected by the fair report

27  privilege of § 47.

28

United States District Court

For the Northern District of California

> The gist or sting of the articles is that [the plaintiff] was convicted on his no contest plea to several serious tax crimes. In view of the sentence imposed, the offenses certainly fit that description. The facts of the crimes were accurately reported described in the articles, as were the court proceedings and judgment. "Tax fraud" and "tax evasion" are harsh terms; but we cannot say that the average reader would have viewed the offenses differently, given the amount of gross income involved and the length of time it had gone unreported, had less color descriptions been chosen. In short, while perhaps overblown or exaggerated, the terms are easily within the literary license concept . . . .

*Id.* at 127.

Like the plaintiff in *Jennings*, Mr. Tiwari was not convicted of a felony, rather only a misdemeanor. However, the fact that he was convicted of only a misdemeanor – which was not by its terms a sexual offense and which was then reduced to an infraction as part of a plea deal – would not have affected a viewer. The broadcast in October 2010 consisted not only the epilogue but also the underlying footage showing Mr. Tiwari's conduct (as well as the conduct of other individuals). Thus, even if the actual truth had been reported, a viewer would have no different view of Mr. Tiwari because he or she would still have seen the footage of "To Catch a Predator" that captured his underlying conduct. The October 2010 epilogue which contained the incorrect information cannot be viewed in isolation apart from its context. In *Jennings*, for example, the court considered the entirety of the articles. Similarly, in *Colt v. Freedom Communs., Inc.*, 109 Cal. App. 4th 1551 (2003), the court did not "pars[e] [through the] words and sentences [used] in [newspaper] articles" but rather considered whether "[t]he articles fairly describe the gist of plaintiffs' misconduct." *Id.* at 1560. Thus, here, the entire October 2010 broadcast must be taken into account, and not simply the epilogue on its own, as that is what NBC published. Because the natural and probable effect on the viewer of the broadcast would be no different if the epilogue had reported Mr. Tawari's correct conviction correctly, the epilogue taken in context was substantially true for the purposes of § 47(d).

Accordingly, the Court concludes that, although the defamation claim is not time barred, dismissal of the claim is still warranted based on the fair report privilege of § 47(d). Because the Court resolves this issue in NBC's favor, it need not reach NBC's final argument regarding the retraction.

C.      Motion for Protective Order

Finally, NBC seeks a stay of discovery pending this Court's decision on its motion to dismiss and accompanying motion to strike.  As a practical matter, NBC has largely achieved the relief sought simply by filing its motion for a protective order.  (Mr. Tiwari could have asked, but did not ask, for the motion to be heard on shortened time.)

Nevertheless, on the merits, the motion is denied.  Accordingly, discovery on all claims is to proceed.

### III.   CONCLUSION

For the foregoing reasons, the Court denies the motion to dismiss, grants in part and denies in part the motion to strike, and denies the motion for protective order.

This order disposes of Docket Nos. 79, 84, and 85.


IT IS SO ORDERED.


Dated:  October 25, 2011

_____
EDWARD M. CHEN
United States District Judge

United States District Court
For the Northern District of California